```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------X
                                      :
UNITED STATES OF AMERICA                              22 Cr. 99 (NSR)
                                      :
    - v. -
                                      :

BOBBY ALLEN.
                                      :

--------------------------------------X
```

SENTENCING MEMORANDUM

Dated:    White Plains, New York
          July 13, 2022

                                        Federal Defenders of New York
                                        Benjamin Gold
                                        Attorney for Mr. Allen
                                        81 Main Street
                                        White Plains, NY  10601
                                        (914) 458-8128

To: Damian Williams
    United States Attorney
    Southern District of New York
    One St. Andrews's Place
    New York, New York
    Attn:  AUSA Nicholas Bradley

# Federal Defenders
## OF NEW YORK, INC.

Southern District
81 Main Street, Suite 300
White Plains, N.Y. 10601-4150
Tel: (914) 428-7124 Fax: (914) 948-5109

David E. Patton
*Executive Director
and Attorney-in-Chief*

Southern District of New York
Jennifer L. Brown
*Attorney-in-Charge*

Via e-mail and ECF

July 13, 2022

The Honorable Nelson S. Román
District Court Judge
Southern District of New York
300 Quarropas Street
White Plains, New York  10601-4150

    Re:    United States v. Bobby Allen
              22-CR-99 (NSR)

Dear Honorable Román:

    At his upcoming sentencing, Bobby Allen (herein Mr. Allen) is facing a vastly excessive sentence based on a flawed sentencing scheme that even the Justice Department has criticized as leading to excessive and racially disparate outcomes. While Mr. Allen was involved in unlawful narcotics activity, his past – which includes childhood sexual abuse and years of substance abuse – is mitigating. Under these circumstances, and especially considering Mr. Allen's remorse and the harsh conditions of his confinement, a sentence of a sixty-months is more than sufficient.

### *Mr. Allen's Childhood*

    Mr. Allen was born in 1966 in Roxboro, North Carolina. *Id*. ¶ 48. He was raised by his disabled mother, who subsided on public assistance because she was deaf and mute. *Id*. ¶ 49, 53. The family soon relocated to Newburgh, New York, where Mr. Allen was initially raised. Despite his mother's disability, Mr. Allen communicated with his mother by reading her lips. *Id*. ¶ 53. Mr. Allen does not recall much from his early childhood, although he does remember that his mother drank alcohol and, at times, was physically and mentally abusive. *Id*. When he was eleven or twelve, Mr. Allen was sent to live with his grandfather and uncle in Milton, North Carolina. *Id*. ¶ 54. Mr. Allen's grandfather drank heavily, and Mr. Allen received little supervision and guidance. *Id*. During this time period, Mr. Allen started drinking and regularly using marijuana. *Id*. ¶ 75. He was also sexually abused. *Id*. ¶ 54.

    When he was thirteen, Mr. Allen missed his mother, so he returned to his mother's care in Newburgh, New York. *Id*. But when he returned to New York he

felt unwelcome and as if his mother "hated" him, so – at thirteen – Mr. Allen hitchhiked back to North Carolina and returned to his grandfather's home. *Id.* ¶ 55. He enrolled in school, but continued to drink alcohol and, while in the eighth grade, Mr. Allen dropped out of school. *Id.* At sixteen, Mr. Allen returned to New York and began using heavier drugs, including crack. *Id.* ¶ 56, 77-78. He originally resided with his mother, but then lived with friends and in the streets. *Id.* ¶ 56. At eighteen (in 1984 or 1985), Mr. Allen moved to New York City. *Id.*

*Adult Years and Drug Addiction*

In New York City, Mr. Allen used cocaine and crack daily and he occasionally used heroin and PCP. *Id.* ¶ 77-78. While in his late teens and early 20s, Mr. Allen was repeatedly arrested for crimes related to his drug use.[1] *Id.* ¶ 32. This pattern continued throughout Mr. Allen's young adult years. At twenty-six (in 1992), Mr. Allen was arrested for NYPL § 220.16(1), a statute which prohibits the possession of "a narcotic drug with intent to sell it". *Id.* ¶ 33.[2] *Id.* At twenty-seven (in 1993), Mr. Allen was convicted of drug possession under NYPL § 220.06(1).[3] *Id.* ¶ 34. Mr. Allen was sentenced to concurrent terms of six and a-half to thirteen years of incarceration and thirty to sixty months. *Id.* ¶ 34-35.

Mr. Allen's drug use continued throughout his adult life, contributing to his convictions for DWI (2001 and 2012), attempted third-degree narcotics possession (2007)[4] and conspiracy (2007). *Id.* ¶ 36-38. And in 2014, Mr. Allen was found in possession of a firearm and sentenced to five-years. *Id.* ¶ 39.

*Employment and Family*

Despite Mr. Allen's convictions and his life debilitating substance abuse, Mr. Allen has been able to work a wide variety of jobs. He has worked as a masonry assistant for a school (1998-1999), a maintenance worker for the City of Newburgh

---

[1] The crimes vary from felonies such as attempted robbery and attempted grand larceny and misdemeanors such as drug possession, petit larceny and failure to pay for public transportation.

[2] The PSR does not indicate the statute Mr. Allen was convicted of, but the RAP sheet provided by the Government indicates that the conviction was for NYPL §§ 110/220.16(1).

[3] Specifically, Mr. Allen was convicted of 5th Degree Criminal Possession of a Controlled Substance, which prohibits possessing "a controlled substance with intent to sell it."

[4] This conviction was under NYPL §§ 110/220.16(1).

(2000-2002), a laborer at the GAP's distribution center (2009-2010), a wood cutter at a lumberyard (2018), a driver for a medical transportation company (2018-2019) and a unionized laborer through the Laborers' International Union of North America, Local No. 7 (2019-2021). *Id.* ¶ 91-97. Mr. Allen's work through the Laborers' Union was so impressive that he will be able to return to work once he is released from incarceration and the union leadership wrote a letter explaining that Mr. Allen is a "member in good standing," has "maintained an excellent work record throughout his years . . . [and has] volunteered both in union activities and community services." Dean Tamburri Letter (attached as Exhibit A).

Family is very important to Mr. Allen. He is close to his mother, who lives nearby and who wrote a letter to the Court stating that his children and siblings miss Mr. Allen and explaining that she was a young mother who "fail[ed] to offer Bobby the best opportunities in life to lead a successful life."[5] Louise Allen Letter (Exhibit B). Mr. Allen's brother, Nasihah Jones, also wrote a letter to the Court. Nasihah Jones Letter (Exhibit C). In his letter, he acknowledges that Mr. Allen has a "criminal history and poor decision making" but he also notes that Mr. Allen now "realizes that either he makes serious reforms in his life or he dies a prisoner." *Id*.

Mr. Allen is engaged to Sophia Jackson. PSR ¶ 62, 65. The two have been romantically involved since 2012. *Id.* Ms. Jackson reports that Mr. Allen has a "big heart" and is devoted to his family. *Id.* ¶ 65. In her letter to Your Honor, Ms. Jackson explains that "Bobby . . . is a good person" who provided great help to Ms. Jackson and her children. Sophia Jackson Letter (Exhibit D). She describes Mr. Allen as an "outstanding stepfather" and "a caring father and boyfriend." *Id.*

### *The Offense, Acceptance of Responsibility and Remorse*

On June, 15, 2021, law enforcement searched Mr. Allen's home and recovered roughly 265 grams of crack and 136 grams of cocaine. PSR ¶ 9-11. During his arrest, Mr. Allen explained that he had been selling drugs. *Id.* ¶ 13. Mr. Allen was arrested and has been detained continuously since his arrest. *Id.* ¶ 14, P. 1.

Accepting responsibility, Mr. Allen waived indictment, waived discovery and, on March 21, 2022, he pleaded guilty. *Id.* ¶ 4. Mr. Allen has expressed significant remorse for his conduct. Bobby Allen Letter (attached as Exhibit E). In his letter to Your Honor, Mr. Allen apologized, stating,

> I first want to start off by saying that I am truly sorry for
> my actions and especially to my family or gave anybody
> [sic] something that might cause them to become

---

[5] Mr. Allen has four adult children. PSR ¶ 57-59. He did not raise his children, but he contributed financially to them and has maintained relationships with them. *Id.*

> addicted. I own my bad decisions, and I accept the time I
> am given. . . . I understand that what I did was wrong. . .
> I will do whatever I can to make up for my bad decisions,
> and I am eager to turn a page. *Id.*

### *Guidelines Objection*

According to Probation, Mr. Allen is a career offender because his state convictions for narcotics related offenses trigger the "career offender" sentencing enhancement under USSG § 4B1.1. PSR ¶ 27, P. 26. But, as detailed below, Mr. Allen's state convictions do not trigger the "career offender" enhancement because the state statutes at issue criminalize conduct that is lawful under federal law.

To determine whether a prior drug offense counts as a controlled substance offense for purposes of U.S.S.G. § 4B1.2(b), courts are to apply "categorical" and "modified categorical" approaches. *United States v. Savage*, 542 F.3d 959, 964 (2d Cir. 2008). Under these approaches, a court first considers the elements of the offense, not the defendant's actual conduct and then compares the elements of the prior offense to the federal definition of such an offense. *Id.* If the elements of the prior offense are broader than the federal definition, the offense does not count. *Descamps* v. *United States*, 570 U.S. 254, 260-61 (2013). *See United States v. Townsend*, 897 F.3d 66 (2d Cir. 2018) (applying "categorical" approach and determining that N.Y.P.L. § 220.31 could not constitute a "controlled substance offense" under federal law because New York's statute criminalized the sale of HCG, a drug that is not a controlled substance under federal law).

In this case, Mr. Allen was convicted of NYPL §§ 220.06(1) and 220.16(1), statutes that prohibit possession with the intent to sell a "narcotic drug[s]."[6] New York's definition of "narcotic drug" is broader than its federal counterpart. This is because Schedule II(b)(1) of the New York Public Health Law criminalizes the possession or sale of naloxegol, while federal law contains no such exclusion. 21 C.F.R. § 1308.12(b)(1). Additionally, New York's statutes criminalize the possession and sale of certain cocaine isomers that are not prohibited under federal law. As such, Mr. Allen's convictions do not constitute controlled substance offenses under USSG § 4B1.1.

---

[6] NYPL § 220.16(1) prohibits possessing a "narcotic drug with intent to sell it" and NYPL § 220.06(1) prohibits possessing a "controlled substance with intent to sell it." Under New York law, a "controlled substance" is any substance that is referenced in schedule I through V of Section 3306 of the State Public Health Law, and includes substances considered a "narcotic drug" under New York law. *See* NYPL § 220.00(5), 220.00(7), NYPH § 3306.

In *Townsend*, the Second Circuit held that, "If a state statute is broader than its federal counterpart – that is, if the state statute criminalizes some conduct that is not criminalized under the analogous federal law – the state conviction cannot support a [Guidelines enhancement]". 897 F.3d at 72. Applying *Townsend*, it is clear Mr. Allen's convictions do not constitute a controlled substance offense because the state statute criminalizes substances that are not unlawful under federal law.

While the Second Circuit has not specifically analyzed this issue, multiple courts in this Circuit and others have held that New York's inclusion of naloxogel as a prohibited "narcotic drug" means that New York's statute cannot constitute a "controlled substance offense." As explained by the Drug Enforcement Administration, naloxegol is a derivative of opium. *See* Schedules of Controlled Substances: Removal of Naloxegol from Control, 80 Fed. Reg. 3468-01 (Jan. 23, 2015). Under New York law, "any . . . derivative . . . of opium or opiate" is unlawful to possess. *See* NYPHL § 3306, Schedule II(b)(1). Thus, naloxegol is absolutely prohibited under state law.

*United States v. Swinton*, 495 F. Supp. 3d 197 (W.D.N.Y. 2020), is instructive. In *Swinton*, the defendant had previously been convicted of N.Y.P.L. § 220.39(1), a statute that prohibits the sale of a narcotic drug. 495 F. Supp. 3d 197 (W.D.N.Y. 2020).[7] Judge Elizabeth A. Wolford held that the conviction *did not* constitute a federal controlled substance offense because "New York criminalizes the sale of naloxegol, while federal law does not." *Id* at 206. Thus, Judge Wolford concluded that the defendant's "conviction for violating N.Y.P.L. § 220.39(1) does not qualify as a controlled substance predicate offense." *Id.* at 210. The Honorable Cathy Seibel reached the same conclusion in *United States v. Augustine*, 17-cr-753. A copy of the *Augustine* transcript is attached as Exhibit G.

As held in *Swinton* and *Augustine*, Mr. Allen's state convictions cannot constitute a "controlled substance offense" because the state definition of "narcotic" includes naloxegol, which means that the state statute is broader than its federal counterpart. Accordingly, Mr. Allen's convictions cannot constitute a controlled substance offense and he cannot be considered a career offender under USSG § 4B1.1.

There is second reason Mr. Allen's state convictions do not constitute "controlled substance offenses." New York Public Health Law § 3306 defines, as a narcotic, various "isomers" of cocaine that are not prohibited under federal law. N.Y. Pub. Health L. § 3306, Sched. II(b)(4). *See People v. Burnett,* 245 A.D.2d 460,

---

[7] A copy of the Court's written decision in *United States v. Swinton* is attached as Exhibit F.

460 (2d Dept. 1997) ("Contrary to the defendant's contention, a controlled substance under Schedule II of Public Health Law § 3306 includes cocaine and all of its isomers"). Federal law, however, only prohibits optical or geometric isomers. 21 C.F.R. § 1300.01(b) (2021) (defining the term "isomer" as used in 21 C.F.R. § 1308.12(b)(4)).

"Narcotic drug" is a term of art under New York law, defined to include a number of substances, including "cocaine." NYPL § 220.00(7) (defining "narcotic drug" to include substances "listed in schedule . . . II" of § 3306 of the Public Health Law); N.Y. Pub. Health L. § 3306, Sched. II(b)(4) (defining "cocaine"). The federal Controlled Substances Act likewise controls "cocaine." 21 U.S.C. §§ 802(6), 812 Sched. II(a)(4) (U.S.C.A. 2019); 21 C.F.R. § 1308.12(b)(4) (2019). However, as district courts have uniformly found, there is a categorical mismatch between the operative New York state definition of "cocaine" and the federal definition of "cocaine," such that New York convictions relating to "narcotic drugs" do not constitute federal controlled substance offenses. *See United States v. Gutierrez-Campos*, ___ F.4th ___, No. 21 CR. 40 (JPC), 2022 WL 281582, at 12-16 (S.D.N.Y. Jan. 31, 2022) (analyzing the New York definition of "narcotic drug" and "cocaine" in under New York law); *United States v. Fernandez-Taveras*, 511 F. Supp. 3d 367, 372-374 (E.D.N.Y. 2021).[8]

The federal definition of "cocaine" in 2013 (as now) included only the "optical or geometric isomers" of the cocaine molecule. 8 C.F.R. § 1300.01(b) (2019) (defining the term "isomer" as used in 21 C.F.R. § 1308.12(b)(4) (scheduling "cocaine and . . . [its] isomers")). *Fernandez-Taveras*, 511 F. Supp. 3d at 373; *Gutierrez-Campos*, 2022 WL 281582 at *13. "Isomers" are "molecules that share the same chemical formula but have their atoms connected differently, or arranged differently in space." *U.S. v. Phifer*, 909 F.3d 372, 376 (11th Cir. 2018) (internal citation omitted).

---

[8] *Fernandez-Taveras* and *Gutierrez-Campos* were both illegal re-entry cases in which the defendants challenged the legality of their prior removal orders. Other courts in this Circuit have examined the same issue as it arises under ACCA or the Career Offender sentencing guideline, and have likewise uniformly concluded that prior New York convictions involving a "narcotic drug" did not categorically trigger enhanced sentences. Copies of the transcripts are attached as exhibits. *See United States v. Valdez-Simmons,* No. 20-cr-294 (S.D.N.Y. Dec. 14, 2021) (Castel, J.) (oral op., Tr. at 6–7) (docketed at ECF # 43; copy attached as Exhibit H); *United States v. Louissaint,* No. 20-cr-685 (S.D.N.Y. Nov. 17, 2021) (Castel, J.) (oral op., Tr. at 24–26) (docketed at ECF # 35; copy attached as Exhibit I); *United States v. Minter,* No. 20-cr-389 (S.D.N.Y. Oct. 12, 2021) (Koeltl, J.) (oral op., Tr. at 3–4) (docketed at ECF # 72; copy attached as Exhibit J); *United States v. Ferrer*, No. 20-cr-650 (S.D.N.Y. Jul. 21, 2021) (Buchwald, J.) (oral op., Tr. at 45–46) (docketed at ECF # 25; copy attached as Exhibit K); *United States v. Baez*, No. 20-cr-24 (S.D.N.Y. July 1, 2021) (Koeltl, J.) (oral op., Tr. at 6–11) (docketed at ECF # 50; copy attached as Exhibit L).

"Optical" and "geometric" isomers, which require specific arrangements of molecules in space, are different from "positional" or "constitutional" isomers, which do not. *Phifer*, 909 F.3d at 377 & n.5. Therefore, the optical and geometric isomers of cocaine are only a subset of its possible isomers. *Fernandez-Taveras*, 511 F. Supp. 3d at 373; *Gutierrez-Campos*, 2022 WL 281582, at *13. There are also "constitutional" and "positional" isomers of cocaine, which are excluded from the federal definition. *Gutierrez-Campos*, 2022 WL 281582, at *13–14.

Meanwhile, since 1978 the New York definition of "cocaine" has included *all* of the isomers of the cocaine molecule. N.Y. Pub. Health L. § 3306 Sched. II(b)(4) (proscribing "cocaine . . . and [its] . . . isomers," without restriction); *Fernandez-Taveras*, 511 F.3d at 373 (citing *People v. Burnett*, 245 A.D.2d 460 (N.Y. App. Div. 2d Dep't 1997)); *Gutierrez-Campos*, 2022 WL 281582, at *13. As the government conceded in one similar case in this District, the New York definition of "cocaine" is therefore overbroad relative to the federal definition. *Fernandez-Taveras*, 511 F.3d at 374 ("As a result of the difference in the definitions of cocaine under New York law and federal law, possession of certain cocaine isomers is illegal under the New York statute but legal under the CSA.").[9]

As many courts have noted, this difference between the New York and federal definitions of "cocaine" was not happenstance or drafting error; it was a result of divergent policy decisions. *Fernandez-Taveras*, 511 F.3d at 374; *Gutierrez-Campos*, 2022 WL 281582, at *15; *see also, e.g.*, *Baez*, Tr. at 10 (Exhibit L). The federal Drug Enforcement Administration clearly knows how to place or not place various classes of isomers on the federal controlled substance schedules when it chooses to do so. *See generally* 21 C.F.R. § 1300.01 (definition of "isomer") (covering different combinations of "optical," "positional," or "geometric" isomers, depending on the drug involved); *Gutierrez-Campos*, 2022 WL 281582, at *13 ("The federal cocaine definition could have included 'positional' (or other) isomers, but it did not."); *Fernandez-Taveras*, 511 F. Supp. 3d at 373 (observing that the federal drug schedules elsewhere include positional isomers of proscribed substances, but omit that class of isomers for cocaine).

As for the New York definition, legislative history reveals that the state's broad coverage of cocaine isomers was an intentional result of legislative action. In

---

[9] The government did not dispute the mismatch between the state and federal "cocaine" definitions in *Fernandez-Taveras*, *see id.* at 374, and it subsequently withdrew its appeal of that decision, *United States v. Fernandez-Taveras*, No. 21-cr-155, 2021 WL 1664107 (2d Cir. Apr. 5, 2021). The government did dispute this point in *Gutierrez-Campos* and the other cases cited *supra* n. 4, but as noted, as far as defense counsel is aware, all of the courts to examine the issue in this Circuit have concluded that the New York statute sweeps more broadly than its federal counterpart.

1978, the New York State legislature was concerned about cases in which criminal defendants had challenged whether some isomers of cocaine (which commonly-used forensic lab technology would identify as cocaine) were controlled substances at all—the so-called "isomer defense." Sponsor's Mem., Bill Jacket, L. 1978, ch. 100 (attached as Exhibit M). The Sponsor's Memorandum accompanying the legislation that added cocaine isomers to the state's schedule of narcotic drugs explained that the "statutory loophole" exploited by the isomer defense—i.e., the suggestion that drugs identified as cocaine could in fact be a cocaine isomer that was not illegal—"could be . . . closed by enacting this amendment which would include *all isomers* of cocaine . . . in the schedule of controlled substances." Exhibit M (emphasis added). The state simply decided broader was better, and deliberately proscribed any and all isomers of cocaine to forestall an "isomer defense," including positional or constitutional ones. *See Fernandez-Taveras*, 511 F.3d at 373 ("The New York Legislature made a different policy choice to define cocaine as broadly as possible, including all isomers."); *accord Gutierrez-Campos*, 2022 WL 281582, at *15 ("[I]t appears that the New York legislature intended to have its law reach all cocaine isomers. . . . [W]hile New York *could have* chosen to define isomers of cocaine to include only geometric and optical isomers, it simply chose not to."); *Baez-Medina*, Tr. at 10 (legislative history shows that "the chosen solution of the New York State legislature was . . . to control all isomers of cocaine. Whether wise or not or overbroad or not, the provisions of the New York state law should be understood as drafted until amended. The federal law pursued the narrower path of prohibiting geometric and optical isomers"); *Ferrer*, Tr. at 46 (Exhibit. K) ("[T]he term is 'all isomers,' and I cannot rewrite the statute.").

The Honorable Garaufis recently examined this issue in *United States v. Holmes*, 2022 WL 1036631 (EDNY 2022).[10] After reviewing expert testimony, the legislative history of New York's Public Health Law and the text of the federal drug schedule, Judge Garaufis concluded that "New York Law covers non-optical, non-geometric isomers in its definition of isomers of cocaine, whereas the CSA does not." *Id.* As such, New York's statute is broader than its federal counterpart and Mr. Allen's state convictions cannot constitute a controlled substance offense. On July 11, 2022, the Honorable Cathy Seibel agreed with Judge Garaufis's analysis and held that New York's definition of cocaine was broader than the federal counterpart and that NYPL § 220.16 therefore could not trigger a career offender enhancement. *See United States v. Rafael Almonte*, 21 Cr. 566 (CS).[11]

For these reasons, Mr. Allen is not a Career Offender. According to Probation and the Government's plea agreement, if the Career Offender enhancement do not apply, Mr. Allen's final offense level would be 25 and, with ten Criminal History

---

[10] A copy of Judge Garaufis's decision in *Holmes* is attached as Exhibit N.

[11] I have ordered the transcript and will provide it to Your Honor if requested.

Points, Mr. Allen would fall within Criminal History Category V.  PSR ¶ 21-30, 32-39, P. 30.  As such, and as provided for by the plea agreement, Mr. Allen's non-Career Offender Guidelines are 100 to 125 months.  PSR P. 30.  In calculating these non-Career Offender Guidelines, both Probation and the Government gave Mr. Allen two criminal history points for committing this offense while on state supervised release.  PSR ¶ 41.  The defense agreed that this enhancement applied under USSG § 4A1.1(d) and does not object to the non-Career Offender calculations within the plea agreement, but it is worth noting that while he was incarcerated on these charges Mr. Allen received paperwork from New York State indicating that his post-release supervision was discharged on February 20, 2021, which is several months before his criminal conduct in this case.  *See* Certificate of Final Discharge (attached as Exhibit O).   Without the two-point enhancement, Mr. Allen's criminal history score would be eight, resulting in a Guidelines Range of 84-105 months.

### *The Most Appropriate Sentence:  Sixty Months*

As Your Honor is well aware, in selecting a sentence this Court takes as its "lodestar the parsimony clause of 18 U.S.C. § 3553(a)." *United States v. Douglas*, 713 F.3d 694, 700 (2d Cir. 2013). That provision directs sentencing courts to "'impose a sentence sufficient, but not greater than necessary, to comply with' the factors set out in 18 U.S.C. § 3553(a)(2)," i.e., "proportionality, deterrence, incapacitation, and rehabilitation." *Id*. In *United States v. Ministro-Tapia*, 470 F.3d 137 (2d Cir. 2006), the Second Circuit explained that if the Court believes a lower sentence will be as effective as a higher sentence in serving the purposes of sentencing, **it must choose the lower sentence**. *See id*. at 142 (observing that where a guidelines sentence is "in equipoise with [a] below-the-range sentence," the parsimony clause requires imposition of the lower sentence).  In this case, and as detailed below, a sentence of sixty months is more than sufficient.

A. <u>The Guidelines are Not Entitled to Deference and Will Lead to an Unjust and Excessive Sentence</u>

When sentencing a defendant, the Court "may not presume that the Guidelines range is reasonable," but rather "must make an individuated assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 50 (2007); *see also Nelson v. United States*, 555 U.S. 350, 352 (2009).  The Supreme Court has specifically recognized that the Sentencing Commission's failure to use its institutional expertise to independently determine appropriate sentences provides a substantial basis for courts to deviate from the Guidelines application in crack cases.  *See Kimbrough v. United States,* 552 U.S. 85, 109-110 (2007).  This is because, unlike most guidelines, U.S.S.G. § 2D1.1 is based on neither empirical data nor technical expertise.  Instead, it is purely a quantity-based model, divorced from science and reason.  *See Spears v. United States*, 555 U.S. 261, 265-266 (2009) ("[W]e now clarify that district courts are entitled to reject and vary categorically from the crack cocaine Guidelines based on a

policy disagreement with those Guidelines"); *United States v. Diaz*, 11 Cr. 821 (JG) 2013 WL 3222243 (E.D.N.Y. Jan 28, 2013) (discussing the flaws in the drug guideline at length and determining to accord the high ranges it produces "very little weight"), cited with approval in *United States v. Corsey*, 723 F.3d 366, 379 (2d Cir 2013).

Here, Mr. Allen's sentencing exposure nearly doubles because he possessed crack rather than cocaine. This is problematic. Since 1995, the Sentencing Commission has recommended that the disparity between crack and powder cocaine be eliminated. On June 22, 2021, the Department of Justice joined that call and urged Congress to eliminate the disparity and pass the "Eliminating a Quantifiably Unjust Application of the Law Act" (also known as the "EQUAL Act"). *See* Department of Justice Statement regarding the EQUAL Act (Exhibit P). On September 28, 2021, the House of Representatives passed the EQUAL Act by a vote of 361 to 66, with nearly 70 percent of the GOP and 100 percent of the Democrats voted in favor of ending the crack/powder disparity. It is currently being considered in the Senate.

The Department of Justice has presented Congress with three main arguments for eliminating the crack/powder cocaine disparity. *Id*. at 6. First, it "is simply not supported by science." Second, "the crack/powder sentencing differential is still responsible for unwarranted racial disparities in sentencing." And third, "the higher penalties for crack cocaine offenses are not necessary to achieve (and actually undermine) our law enforcement priorities." *Id*.

In a statement to Congress, the Acting Director of National Drug Control Policy, Regina LaBelle explained, "The current disparity is not based on evidence yet has caused significant harm for decades, particularly to individuals, families, and communities of color. The continuation of this sentencing disparity is a significant injustice in our legal system, and it is past time for it to end." *See* Director LaBelle Testimony, June 22, 2021 (Exhibit Q).

While the defense is not contesting that Mr. Allen possessed crack, when determining an appropriate punishment, it is relevant that the crack guidelines create an enormous sentencing disparity. Under the Guidelines, Mr. Allen's base offense level is 28, mostly because the case involved 265 grams of crack.[12] PSR ¶ 21. Had Mr. Allen possessed only cocaine, his base offense level would be 22. As

---

[12] Mr. Allen also possessed 136.7 grams of cocaine, which is included in this calculation. PSR ¶ 21.

such, without the draconian crack Guidelines, Mr. Allen's Guidelines would be reduced significantly to 57 to 71 months of incarceration.[13]

The defense submits that the deficiencies in the current Guidelines – especially the Department of Justice's disavowal of the Guidelines and the recent vote in the House and the legislation's support in the Senate – provides significant and important mitigation warranting a substantial variance. As such, the Court should sentence Mr. Allen to sixty months.

   B.   <u>The Nature and Circumstances of Mr. Allen's Crime Do Not Compel a Lengthy Prison Sentence</u>

While Mr. Allen undeniably broke the law, he is subjected to a mandatory minimum of sixty months which is more than sufficient to punish Mr. Allen for being involved in narcotics activity. As noted by Probation and mentioned above, legislation that is pending in Congress has the potential to significantly lower Mr. Allen's sentencing exposure. PSR P. 30. This justifies a variances, especially in light of Mr. Allen's conduct which was not violent and did not involve firearms.

   C.   <u>Mr. Allen's History and Characteristics Warrant Leniency</u>

Mr. Allen's childhood was extremely difficult. His grew up poor and without a father figure. His mother acknowledges that she did not provide sufficient structure and support for Mr. Allen and when she passed him off to her family he was cared for by an alcoholic grandfather who allowed Mr. Allen to drink as an eleven or twelve year old boy. *See* PSR ¶ 54-55, 75-76 and Louise Allen Letter (Exhibit B). During this time period, Mr. Allen was sexually abused. PSR ¶ 54.

While Mr. Allen's criminal record is relevant, it is mitigating that he has suffered from substance abuse since he was a young boy. The bulk of his criminal conduct is related to substance abuse and Mr. Allen is motivated to receive mental health and substance abuse treatment. PSR ¶ 73-85. Additionally, as recognized by Probation, Mr. Allen has a strong work history. *Id*. P. 30. This, combined with his remorse and his familial ties, justifies a reduced sentence.

   D.   <u>A Sentence of Sixty Months Would Provide Sufficient Deterrence.</u>

Regarding deterrence, Mr. Allen has been specifically deterred. Due to his actions, Mr. Allen was arrested and incarcerated and now he faces a mandatory minimum of five-years. Research shows that a more severe sentence does not lead

---

[13] This calculation is based upon a base offense level of 22, a three-point reduction for acceptance of responsibility under USSG § 3E1.1(a) and (b), and a Criminal History Score of 10, rending a final (non career offender) offense level of 19.

United States v. Bobby Allen  July 13, 2022
Sentencing Submission  Page **12** of **13**

to greater specific deterrence for individual defendants. See The Honorable Peggy Fulton Hora & Theodore Stalcup, *Drug Treatment Courts in the Twenty-First Century: The Evolution of the Revolution in Problem-Solving Courts*, 42 GA. L. REV. 717, 724 (2008). The same can be said for general deterrence. Studies have proven that more severe sentences do not result in greater general deterrence. Michael Tonry, Purposes and Functions of Sentencing, 34 CRIME AND JUSTICE REVIEW: A REVIEW OF RESEARCH 28-29 (2006) ("[I]ncreases in severity of punishment do not yield significant (if any) marginal deterrent effects. . . . Three national Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence."). It is the certainty of being prosecuted rather than the severity of punishment that deters crime. See Nat'l Inst. of Just., *Five Things About Deterrence,* Jun. 6, 2016. The fact that Mr. Allen was arrested, detained, prosecuted, convicted and sentenced, will provide sufficient general deterrence; a term of incarceration in excess of five-years is not required for an individual who, like Mr. Allen, is remorseful and suffers from his own addictions.

    E.    <u>The Harsh Conditions of Being Incarcerated During the COVID-19 Pandemic Justify a Significant Variance.</u>

Mr. Allen has been incarcerated for his involvement in this case since June 15, 2021. PSR P. 1. As such, his entire period of incarceration has been during the COVID-19 pandemic. The jail has significantly limited its jail programing and all inmates, including Mr. Allen, have experienced frequent periods of quarantine. Due to these jail conditions, Mr. Allen has been punished more harshly than similarly situated defendants who were not jailed during the COVID-19 pandemic.

Courts have long recognized that sentencing judges may grant leniency based upon unduly harsh treatment in pretrial custody. This has proven especially true during the COVID-19 pandemic, where every court to sentence a defendant has had to reckon with the difficulties of being incarcerated during a pandemic. *See, e.g., United States v. Carrillo-Berber*, 18 Cr 703 (SDNY. Jun. 11, 2020) (Crotty, J.) (sentencing a defendant to time served in part because of the harsh conditions of confinement during the COVID-19 pandemic); *See, United States v. De Jesus*, 20 Cr. 19 (PAE) (S.D.N.Y. July 1, 2020) (sentencing defendant to time-served plus one day despite a guidelines recommendation of 30-37 months in part because of the COVID-19 related conditions at MCC); *United States v. Morgan*, 19 Cr. 209 (RMB) (S.D.N.Y. May 5, 2020) (cutting the sentence to less than half of the low end of the Guidelines based in part on conditions at MDC); *United States v. Casillas*, 19 Cr. 863 (VSB) (S.D.N.Y. May 4, 2020) (reducing the length of the sentence in part because of conditions at MCC during COVID-19 crisis): *United States v. Pierson*, 14 Cr. 855 (LTS) (S.D.N.Y. May 4, 2020) (same for defendant at MDC); *United States* v. *Alonzo*, 19 CR 721 (LAK) (S.D.N.Y. Nov. 5, 2020) (sentencing defendant in drug-conspiracy case with a Guidelines Range of 57-71 months to time served in part because of the harsh conditions during confinement at the Westchester County Jail); *United States*

United States v. Bobby Allen  July 13, 2022
Sentencing Submission  Page **13** of **13**

v. *Soto*, 19 CR 903 (KMW) (S.D.N.Y. Marc. 30, 2020) (sentencing defendant facing a Guidelines Range of 110-120 months to 60 months of incarceration, in part because of the harsh conditions of the defendant's incarceration).

    Mr. Allen is worthy of such a variance.  Ordinarily, solitary confinement and isolation and the loss of privileges is reserved for infractions, but here Mr. Allen faced harsh conditions through no fault of his own.  And despite the harsh conditions of his confinement, Mr. Allen has had no disciplinary issues at the jail and has been productive as a trustee and has availed himself of the limited programming that has been available.  PSR ¶ 6.  This is relevant and justifies a reduced sentence.

* * *

    There is nothing to be gained by a draconian sentence in this case, especially in light of Mr. Allen's remorse, his sympathetic past and his acceptance of responsibility.  For the reasons set forth above, I respectfully ask that the Court to impose a sentence of sixty-months.

    Thank you for your consideration.

    Sincerely,

    //s

    Benjamin Gold
    Assistant Federal Defender

cc:  AUSA Nicholas S. Bradley